# McHenry's Appeal.

1. Winslow, living in Elk county, sold an undivided half of timber land to Fallon, living in Philadelphia. Fallon gave a mortgage for the unpaid purchase-money; Winslow leased from Fallon to be determined on six months' notice by either party. Winslow took the management and went into exclusive possession. After the determination of the lease by notice from himself, Winslow proceeded on the mortgage, took judgment after two *nihils* and bought the land at sheriff's sale. *Held*, that there was no relation of confidence to prevent Winslow's purchase.

2. Winslow was not in possession for residence or cultivation and was not bound to account as mortgagee in possession or as co-tenant.

3. The burden of showing that Winslow cut timber for which he was bound to account was upon Fallon.

4. Performing a particular service on special request, is not evidence of a general agency even as respects strangers.

5. There was nothing in the relation between the parties to prevent Winslow proceeding on his mortgage without personal notice to Fallon.

[McHenry's Appeal.]

March 23d and 24th 1869. Before THOMPSON, C. J., READ, AGNEW and WILLIAMS, JJ. SHARSWOOD, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Elk county:* In Equity: No. 256, to January Term 1869.

In the court below, James McHenry, on the 1st of December 1864, filed a bill against Reuben Winslow and Elizabeth his wife, B. Rush Petriken and John Fallon. The bill set out that on the 24th of October 1855, Winslow agreed to convey in fee to C. & J. Fallon the undivided half of 5000 acres of land in Elk county, on or before the 1st of January 1856, for the consideration of $30,000, payable in instalments, the last being on the 13th of April 1857, and as soon as the conveyance should be made the Fallons should lease the premises to Winslow for one year, and thereafter from year to year so long as the parties agreed, he paying half-yearly a rent equal to the interest of the purchase-money, together with taxes, and to cut no more than 800,000 feet of timber in any one year; the cost of improving the property, &c., to be borne rateably by both parties. That on the 18th of December Winslow conveyed the one-half the property to the Fallons; that on the 4th of March 1856 the Fallons leased to Winslow their half of the property for one year from January 1st 1856, and until six months' notice be given by either party that the lease should be determined, Winslow agreeing to pay therefor at different rates for the different years, as designated in the lease, payable semi-annually; Winslow to pay the Fallons, in addition, a sum equal to six per cent on any moneys which might be paid by them for the purchase of any adjoining land in which Winslow should take an interest; Winslow to give account of all lumber cut, and pay for all over 800,000 feet yearly, at such price as might be determined on, &c. That on the 24th of April 1858, C. Fallon conveyed all his interest in the land to J. Fallon; that the Fallons held the title in trust for A. Sanches, Duke of Riansares, a resident of France; that J. Fallon, on the 8th of October 1859, conveyed the premises to F. Probst, who on the same day conveyed them to J. Fallon and P. P. Morris for the use of the Duke of Riansares; and that Fallon and Morris, on the 19th of January 1864, conveyed the premises to the plaintiff in fee, together with all their right and claim against Winslow and Petriken under the agreements. The bill averred that a large portion of the consideration ($30,000) payable to Winslow was paid to him in cash and a mortgage dated April 4th 1856 given to him, for $18,171, the residue; which mortgage is recorded in Elk county.

The bill further set out that Winslow resided in Elk county, and took exclusive charge and control of the property, and it was left to his management. That the Fallons resided in Philadelphia, practised law there; knew little of the value of the land, of the timber cut, and of the necessary expenses for its improvement;

11 P. F. SMITH—28

that the Fallons reduced the amount of the mortgage to about $8500; that Winslow never paid any rent or rendered any account of timber cut and removed by him, although, as the plaintiff believed, the amount was large and large profits had been realized; that Winslow, without giving any notice to the Fallons to July Term 1858, issued a scire facias on the mortgage, which was returned "nihil," and on the 12th of August 1858 an alias scire facias, which also was returned "nihil." On the 7th of October 1858 judgment was entered for want of an appearance for $7541.13. That a levari facias was issued September 14th 1859, and 3d day of October, then next the property was sold by the sheriff to Winslow for $5375; that all these proceedings were had without any knowledge of the Fallons, the Duke of Riansares or his attorney; and although Winslow, and Petriken his son-in-law, and acting for Winslow, had conversations with J. Fallon whilst the proceedings were progressing, they studiously concealed these proceedings, and led Fallon to believe that he and Winslow held the property jointly as they had originally. That Petriken, in 1861, told the attorney in fact of Riansares that the sale under the mortgage had been brought about in consequence of differences between C. and J. Fallon, and if these could be settled J. Fallon's interest would be conveyed in trust for Riansares. That Petriken acted from the beginning as the agent and attorney of Winslow, and with his knowledge and assent. That the plaintiff, on the 3d of April 1864, tendered to Winslow $10,028.70, the full amount of the judgment on the mortgage, with interest, and demanded of him a conveyance of the one-half part of the land, but Winslow refused to accept the tender or make the conveyance. The plaintiff also averred that the differences between the two Fallons had long since been settled; that Petriken was interested in the original sale to the Fallons, and in the purchase by Winslow at the sheriff's sale; that Winslow was not entitled to a foreclosure of the mortgage until an account had been rendered to J. Fallon or Riansares of the timber cut, with an offer to pay for the same and to pay the rent according to the agreement. That the acts of Winslow before set out are fraudulent, and by them large and valuable tracts of land, which had been bought for Riansares through the advice and influence of Winslow and Petriken, had been by their combination and fraud swept away, and now claim as their own under the sheriff's sale.

Twenty interrogatories were appended, covering the averments in the bill.

The prayers were for an injunction restraining Winslow and Petriken from conveying more than one-half of the land; for a decree for an account by Winslow of the rent and timber cut; and payment of what shall be found due; for the payment of one-half of the proceeds from the lands which may have been sold: and

for general relief.   Winslow answered, denying knowledge of C. Fallon's conveyance to J. Fallon, that the Fallons held for Riansares, and denied that they did purchase in trust; denying knowledge of the conveyances by which the title became vested in the plaintiff; denying that Petriken was his agent or attorney in selling the lands to the Fallons, and averring that he was the agent of Fallons in other transactions; and that defendant did not cut 800,000 feet of timber in any one year; that the rent due by him had been accounted for; that he gave notice to the Fallons on the 13th of June 1857 that the lease should terminate on the 31st of December of that year, that J. Fallon considered the lease ended at that time, at which the relation between himself and the Fallons as landlord and tenants ceased; he averred that he had frequently written to J. Fallon for payment of the last instalment on the mortgage after it had become due, but Fallon always declined to do so, and that before issuing the scire facias defendant informed Fallon that if not paid he should look to the land; that the judgment on the mortgage was entered seventeen months after the last instalment had become due, and twenty-two months after notice for the termination of the lease; he denied that he had conversations with J. Fallon during the proceedings on the mortgage, and that Petriken was his agent or attorney during the proceedings on the mortgage, denied that Petriken had authority from him to the agent of Riansares, and that Petriken had any interest in the sheriff's sale or the original sale; averred that the Fallons never claimed that defendant had cut more timber than he ought to cut; that the rent was allowed in full in the liquidation of the amount due on the mortgage; denied any fiduciary relation between him and J. Fallon as tenant or otherwise when the proceedings on the mortgage were commenced; had no knowledge of Riansares or any other cestui que trust of Fallon; that the conveyance to the plaintiff was more than four years after the sheriff's sale; Petriken knew nothing of the proceedings on the mortgage till after the sheriff's sale; that at the commencement of the proceedings on the mortgage J. Fallon was notoriously insolvent.   He attached to his answer a number of exhibits of the state of the accounts between him and the Fallons; his notice for determining the lease; a letter, March 31st 1858, from the Fallons to Winslow, acknowledging one of his of March 27th, and saying that they would not be prepared to settle the balance on the bond and mortgage by the middle of the next month, &c.; a letter, May 10th 1859, from J. Fallon to defendant, authorizing him "to rent the saw-mill on our property in Elk county for one year for $300, and for the same time to cut timber for $2 per M. and any arrangement that you may think it advisable to make for our joint interest, in regard to having the farm lands cultivated on shares or otherwise,

will be satisfactory to me, I receiving an equal share with yourself of the proceeds.

" The above contemplates your not taking any interest yourself in the working of the mill or making lumber, &c.  Should you, however, desire to take a part or interest in these operations, I do not mean to say I would have any objection, provided I knew it beforehand so that we correctly understand our respective relations."

The other averments in the bill which are material were admitted or not denied; he answered the interrogatories also to the same effect.

Petriken answered, denying the charges in the bill as against him.

J. Fallon answered, averring amongst other things that the land had been purchased with the funds of the Fallons, and not in trust for Riansares; but that he became interested in the land by the conveyance from Probst to respondent and Morris in October 1859; that at no time did Winslow inform him that he had commenced proceedings on the mortgage, or that he contemplated doing so; nor was anything said or done by any one prior to October 8th 1859 to lead him to suspect that proceedings on the mortgage were intended; that he had no knowledge on the subject; that Winslow frequently, during the years 1857, 1858 and 1859, insisted on payments which were not made, and had he, at any time prior to October 8th 1859, informed respondent that the mortgage would be sued out unless the payments should be made, respondent could and would have made the required payment.

The depositions of Winslow and Fallon in addition to their answers and of other witnesses were taken before commissioners appointed by the court.

The substance of the bill and answers as above given, the facts as stated in the opinion of the judge below, and that of Supreme Court, will sufficiently exhibit the case without a further detail of the evidence.

The opinion of the Court of Common Pleas was delivered by Williams, J. :—

" An examination of the bill and answers furnishes us the following uncontroverted facts, viz. :—

" That on the 24th of October, A. D. 1855, a contract of sale was entered into between Reuben Winslow and C. and J. Fallon, by which Winslow agreed to sell to the Fallons an undivided half of about six thousand acres of land in Elk county, at the price of ten dollars per acre.

" That pursuant to this agreement he made a conveyance to the Fallons of the undivided half of these lands on the 18th December 1855.

" That the Fallons executed and delivered to Winslow a lease

of their interest in these lands on the 4th March 1856, and gave their mortgage for the balance of unpaid purchase-money ($18,171) on the 4th April 1856.

"That afterwards, to wit, at the July Term, A. D. 1858, a writ of scire facias was issued upon the mortgage in the Common Pleas of Elk county; and judgment upon two returns of nihil was had, upon motion in open court, on the 7th October, A. D. 1858.

"That on the 14th September 1859, a writ of levari facias was issued, upon which the sheriff made sale of the undivided half covered by the mortgage, on the 3d October 1859, to Reuben Winslow.

"That a sheriff's deed was made and acknowledged at the following term, i. e., January Term 1860, and recorded in the recorder's office for Elk county on the 1st November 1860.

"This bill was filed on the 1st December 1864; and the relief sought is, that the defendant Winslow be required by the decree of this court to reconvey the undivided one-half so bought by him at sheriff's sale, upon the ground that the proceedings upon the mortgage were fraudulent.

"The complainant shows a title derived from the Fallons in the following manner: C. Fallon conveyed his interest in the Elk county lands to J. Fallon, by deed of sale, 24th April 1858.  J. Fallon made sale of these lands, inter alia, to the Duke of Riansares; and to pass the title made a conveyance to Probst on the 8th October 1859, who, on the same day, reconveyed to J. Fallon and P. P. Morris, in trust, for said Duke of Riansares.  James McHenry purchased from the Duke, and a conveyance was made to him by J. Fallon and P. P. Morris, on behalf of their principal, on the 19th January 1864.  This was more than four years after the sheriff's sale, and more than three years after the sheriff's deed to Winslow had been placed upon record.  McHenry is, therefore, a purchaser with notice, and succeeds only to the rights of J. Fallon, who was the sole owner of the mortgaged interest in these lands, when proceedings were instituted upon the mortgage. If the relations subsisting between Fallon and Winslow were such as to make the sheriff's sale fraudulent as to Fallon, then McHenry, his vendee, is entitled to avail himself of that fraud to the same extent that Fallon could do, if this bill had been filed by him. The material inquiry, therefore, and that upon which the case depends, is, what were the relations subsisting between Winslow and his vendees after the execution of the lease and mortgage by them?  Or, in other words, was there such a relation of trust or confidence established between them as made it the duty of Winslow to give personal notice to the Fallons of the institution of proceedings upon the mortgage?

"The complainant states his position upon this subject, in his bill thus: 'Said Winslow was not entitled at law or in equity to

a foreclosure of said mortgage, until an account had been rendered by him to said John Fallon, of the quantity of the timber cut from said lands, with an offer to pay for the same according to the before-mentioned agreement, and also an offer to pay the rent according to the terms of the agreement.'

" The learned counsel for the complainant upon the argument of this case placed Winslow's duty to account upon the following propositions:

" 1. He was a co-tenant of the fee and as such bound to account for profits, &c.

" 2. He was a lessee and bound by the express terms of his lease to pay rent, &c.

" 3. He was a mortgagee in possession of the mortgaged premises.

" A co-tenant of the fee in possession may be presumed to be in possession by virtue of his title, and liable to account to his co-tenant for the profits of the land, unless it appears affirmatively that he is in possession by virtue of an agreement with his co-tenant and as his lessee. When this appears his possession is referable to, and his liability must depend upon, the agreement or lease. Precisely the same thing may be said of the case of a mortgagee in possession. His possession may be referable to his relation to the land as the holder of the mortgage unless it appears affirmatively that he is in possession not under his mortgage, but as the tenant of the mortgagor under the provisions of a lease which define the extent of his rights and liabilities. Such was the case here.

" The liability of Winslow to account depended, so long as the lease continued, upon the provisions of the lease. After it was terminated, if it was terminated at all, his liability to account depended upon his having made or received profits for which to account.

" Did he account for and pay the rent accruing upon the lease from Fallons to himself? The answer and depositions of Winslow, together with the exhibits attached thereto, show that he did account for the rent from the date of the lease to the 1st January 1858, and that said rent was applied upon the payments falling due from the Fallons upon the mortgage.

" In consideration of this rent he was to be at liberty to cut from the lands, held jointly by himself and Fallons, any quantity of timber, not exceeding eight hundred thousand feet annually. There is no evidence that a larger quantity was cut by him than he was authorized to cut; and he explicitly denies, both in his answer and in his deposition, that he exceeded the amount named in his lease. We can see no obligation to account, prior to January 1st 1858, which was not fully met by Winslow. What was his position after the 1st of January 1858? He testifies that the

notice attached to his answer, and marked Exhibit " C," was pre-
pared by him when in Philadelphia, and handed to his son, R. C.
Winslow, to serve upon C. and J. Fallon.   That his son started to
serve it, and subsequently returned and signed a return of service
on back of the notice; but that he (R. C. Winslow) was deceased
at the time of the taking of the testimony in this case.   This
notice was dated 13th July 1857, and stated the intention of
Winslow to terminate the lease of March 4th 1856, on and after
the 31st of December 1857.   That this was actually served, or
that John Fallon afterwards treated the lease as at an end, would
seem reasonably clear from his letter of May 10th 1859, in which
he authorizes Winslow to rent the saw-mill for $300, and the tim-
ber lands at $2 per thousand feet for the timber-leave or stump-
age.

"The complainant took the depositions of J. W. Winslow and
Julius Jones, to show the cutting of timber upon these lands
during 1858-9.   They both state that they have a general know-
ledge of the 'body of lands in which C. and J. Fallon were
interested with Winslow,' and that large quantities of pine timber
were cut in 1858-9.   Both Winslow and Petriken, in their an-
swers, deny that timber was cut on these lands during these years.
Mr. Winslow, in his deposition, states there was cut, under his
direction, quite a large quantity on the one-half of one of these
warrants, which he says belonged wholly to himself, viz., No. 5;
but that he neither cut timber himself or sold the stumpage or
standing timber to others from any of the lands in which the Fal-
lons were interested; and that the saw-mill standing upon these
lands was idle during the years 1858 and 1859.   The timber
spoken of by J. W. Winslow and Jones may have been, and we think
it reasonable to believe was, that of which Reuben Winslow spoke
as cut upon warrant No. 5.   If so, then the liability of Winslow
to account as a tenant ceased when the lease became inoperative,
and no new liability was created, either as co-tenant of the fee or
otherwise, because no profits were received from the joint estate
for which to account.   Indeed, the tender which was made by the
complainant, and is set out in the bill, may be fairly regarded as
an admission of the amount due upon the mortgage; and it is
inconsistent with the allegation that defendant has not accounted
for the rents accrued under the lease and the profits made prior to
the sheriff's sale.

" Winslow was the vendor of the undivided half of these lands.
The mortgage was the security held by him for the unpaid balance
of the purchase-money.   It was overdue.   The mortgagors lived
in Philadelphia, many miles away from the land, and beyond the
jurisdiction of the courts of Elk county.   Winslow instituted pro-
ceedings upon his mortgage.   He did not communicate that fact
to the Fallons, but taking the usual steps to compel an appear-

[McHenry's Appeal.]

ance, he obtained judgment, upon motion in open court after two returns of nihil, and finally, after about fifteen months from the return of the original sci. fa., brought the lands to sale and himself became the purchaser.   His mortgage gave him the right to process for its collection.   It may be considered hard and unconscionable that he did not advise Fallon explicitly of his intention to bring the land to sale, but we cannot say, from the evidence, that there was a duty resting upon him to give notice such as can be enforced by the courts.   He testifies that ' at the last interview I had with John Fallon before issuing sci. fa. on the mortgage, I informed him distinctly, that if I was not paid, I should look to the land for payment.'   Petriken, in his answer to the sixteenth interrogatory, says, 'I called at the office of John Fallon, and told him the lands were advertised to be sold at the then coming court.'   We understand John Fallon to deny that he received information of the sale until some time after its occurrence.   If he did receive notice he has nothing of which to complain.   If he did not, while he may justly complain of a resort to proceedings on the mortgage as inconsistent with the friendly relations existing between himself and Winslow, yet we hold that no obligation to give notice of such proceeding grew out of the situation of Winslow toward Fallon or toward the land, that we can enforce.   The bill filed in this case is dismissed."   November 16th 1868.

The plaintiff appealed to the Supreme Court, and assigned the following errors:—

1. The court erred in not making a decree that Reuben Winslow and wife should convey to James McHenry the right, title and interest of the lands sold by the sheriff of Elk county to Reuben Winslow, 3d October 1859, upon the payment by James McHenry to Reuben Winslow of the amount of the debt, interest and costs specified in the writ of levari facias, upon which the sale was had.

2. The court erred in dismissing the bill of complaint, and in not granting the relief prayed for by the complainant.

*E. H. Hanson* and *Daniel Dougherty*, for appellants.—Winslow, both as lessee and co-tenant, sustained a confidential relation to Fallon which required him to account: Baker *v.* White, 3 Sumner 475; 1 Story Eq., § 323, 466; Griffiths *v.* Robins, 3 Madd. 191; Leisenring *v.* Black, 5 Watts 303.   Winslow, in the relation he sustained, could not become purchaser of the land: Smiley *v.* Dixon, 1 Penna. R. 439; Myers' Appeal, 2 Barr 463.   Winslow should have applied the money he owed Fallon to the mortgage: Chorpenning's Appeal, 8 Casey 315.   A mortgagee in possession is a trustee for the mortgagor: Lewin on Trusts 145; 3 Powell on Mort. 947; Lanning *v.* Smith, 1 Pars. R. 13.   And will be permitted to get no advantage by reason of his position: Fitzgibbon *v.*

Scanlan, 1 Dow. 261; Guthrie *v.* Kahle, 10 Wright 331; Hole-ridge *v.* Gillespie, 2 John. Ch. Cas. 30. Nor by reason of the necessities of the mortgagor: Ford *v.* Olden, Law Rep. 3 Eq. Cas. 461; Rowe *v.* Wood, 2 J. & W. 553; Bently *v.* Craven, 18 Beav. 75; Maddeford *v.* Austiwich, 1 Simons 89; Pearce *v.* Green, 1 J. & W. 135.

The obligation is the same where the confidential relation is voluntarily assumed: Rankin *v.* Porter, 7 Watts 387; Noel *v.* White, 1 Wright 514. Winslow was in effect a trustee, both buy-ing and selling: Jeremy's Eq. 394. He was bound to disclose all the information he had: Ex parte James, 8 Vesey 337; Oliver *v.* Court, 8 Price 127; Ex parte Bennett, 10 Vesey 381; Campbell *v.* McLain, 1 P. F. Smith 200; Bartholomew *v.* Leech, 7 Watts 472; Downes *v.* Grazebrook, 3 Meriv. 200; Michoud *v.* Girod, 4 Howard 503. Winslow should have notified Fallon: Oliver *v.* Piatt, 3 Id. 396.

*H. Souther* and *R. Brown*, for appellees.—If Winslow is trus-tee, McHenry can recover in ejectment: Cox *v.* Henry, 8 Casey 18. There are exceptions to the rule that a trustee to sell cannot buy: 4 Kent's Com. 438; Tiffany & Ballard on Trusts 481.

The opinion of the court was delivered, July 6th 1869, by

WILLIAMS, J.—If the sheriff's sale of the mortgaged premises did not vest in Winslow a valid title as against Fallon, then McHenry, his vendee, is entitled to an account of the rents and profits of the land, and a conveyance thereof on payment of the residue of the purchase-money, but not otherwise. When he pur-chased from Fallon he had constructive notice of Winslow's title, and could take no greater interest in the mortgaged premises than Fallon himself had. Did Winslow then take an absolute title to the mortgaged premises under the sheriff's sale, or did he take the title, subject to the payment of the debt, in trust for Fallon? The scire facias was not issued on the mortgage until more than a year after it became due, and all the proceedings, including the judgment, execution and sale thereon, were regular and in strict conformity with the requirements of the statute and the uniform practice in such cases. It is not alleged that there was any irregu-larity or defect in the proceedings, or that the judgment was taken for an amount greater than the sum actually due. It follows that Winslow took a good title to the premises unless his relations to Fallon were such as to render the sale fraudulent or voidable. What, then, were the relations subsisting between them at the date of the sale, and were they such as to prevent Winslow from taking a valid title to the land for his own use? Had he a legal right to institute proceedings on the mortgage at the time and in the man-ner he did; or was he bound to account for the rents and profits

[McHenry's Appeal.]

of the premises before proceeding adversely on the mortgage? The appellant contends that he was the lessee of the mortgaged premises, and, therefore, that he had no right to proceed on the mortgage until he had first accounted for the rent which he had stipulated to pay. But the evidence shows that the lease was terminated on the 1st of January 1858, prior to the institution of the suit on the mortgage, and that Winslow had fully accounted for the rent up to that date. The appellant further contends that he was a co-tenant with Fallon of the lands bound by the lien of the mortgage, and that he was in possession of the premises as co-tenant and mortgagee, and in the receipt of profits arising from the sale of timber and stumpage, for which he was bound to account and apply to the extinguishment of the debt, before taking adverse proceedings on the mortgage. It is true that Winslow was a co-tenant with Fallon, but there is no evidence that he was in the actual occupancy of the premises either for the purpose of residence or cultivation. They consisted chiefly of uncultivated woodland, or forests of white-pine, and if Winslow cut no timber and sold no stumpage, as the court below found, then he received no profits from the estate, which they held as tenants in common, for which he was bound to account. There is some evidence that large quantities of timber were cut on the tracts included in the mortgage, in the years 1858 and 1859, but Winslow, in his answer, denies that any timber was cut thereon during either of these years, and the court was of the opinion that the timber mentioned in the depositions of appellant's witnesses, was cut on that part of "Warrant No. 5" which belonged wholly to the defendant, Winslow. The witnesses testify that they are acquainted with the tracts, but they do not designate or distinguish them in any way, nor indicate the tract on which the timber was cut to which they refer. As Winslow admits that he cut a large quantity of timber on his portion of "Warrant No. 5," and positively denies that he cut any timber on either of the tracts included in the mortgage, we should not be justified in setting aside the finding of the court below on evidence so vague and unsatisfactory. The burden of showing that Winslow cut or sold timber for which he is bound to account was on the appellant, and in order to overcome his positive denial in response to the allegations in the appellant's bill, the fact should have been established by clear and satisfactory evidence. There is, then, no sufficient evidence that Winslow had any other possession of the mortgaged premises than that which followed his legal title, and as Fallon was part owner of the lands, he had, by virtue of his legal title, the same possession that Winslow had. Nor is there any evidence that he was acting as the agent of Fallon at the date of the sheriff's sale, in the supervision, care and management of the lands. It is true that, under Fallon's letter of the 10th May 1859, he was authorized to rent the saw-mill, with

[McHenry's Appeal.]

the right to cut timber for one year, and to make any arrangement for the cultivation of the farm lands on shares or otherwise that he might think advisable, but there is no evidence that he accepted the authority, or that he attempted to act under it. Nor can such agency be inferred from the fact that he paid the taxes assessed on the lands of which he was part owner, even if it had been shown that he paid them at the request of Fallon and upon his promise to repay him his share. The performance of a particular service in pursuance of a special request is no evidence of a general agency, even as it respects strangers, much less as between the parties themselves.

Is there anything in his relation to Fallon as co-tenant of the land bound by the lien of the mortgage which would prevent him from instituting proceedings thereon without first giving notice of his intention, or which made it his duty to give Fallon personal notice of the proceedings after they were commenced? If Fallon failed to pay the mortgage-debt at maturity, why were not the same remedies open to him to enforce its payment as if he had not been his co-tenant? We can discover nothing in the relation which ought to modify or affect his rights or remedies, and which should prevent him from proceeding on the mortgage in the same manner and with the same effect as if no such relation had subsisted between them. And for the same reason we are of the opinion that Winslow was under no imperative legal obligation to give Fallon personal notice that he had commenced proceedings on the mortgage. His failure to give him such notice may have been inconsistent with the friendly relations existing between them; yet if he was under no legal obligation to give him personal notice, then the duty, though morally binding in the forum of conscience, is not such as can be enforced by the court. He gave all the notice the law requires, and there is no evidence that he was guilty of any fraudulent concealment or misrepresentation. If Fallon has any reason to complain of his conduct it is of his silence, and not of any positive act done with the intent of misleading him. Nor was there any such haste in the proceedings as would indicate an intention on the part of Winslow to take any undue advantage of Fallon. The property was not exposed to sale until about a year after the judgment had been obtained, and the sheriff's deed was not acknowledged until three months thereafter; and the evidence shows that Fallon was informed that the property had been advertised for sale just before or soon after it took place, and in ample time to have prevented the consummation of the sale, if he had been disposed to prevent it. If he had notice of its advertisement, as he admits that he had, it was his duty to have prevented the consummation of the sale by the payment of the mortgage-debt before the acknowledgment of the sheriff's deed. And if he did not, it was his own fault; and as

[McHenry's Appeal.]

the appellant stands in his shoes, he must bear the consequences of his laches. Fallon knew that the debt was due, and he was informed by Winslow that he should look to the land for its payment, and yet there is not a particle of evidence that he ever offered to make any arrangement whatever for the payment of the mortgage until long after the sheriff's sale. Under all the facts of this case we think the court below was fully justified in dismissing the bill.

Appeal dismissed at the cost of the appellant.

READ, J., dissented.